# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 03-1929

DAMIAN REYES, APPELLANT,

V.

R. JAMES NICHOLSON,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued April 25, 2007                    Decided    July 20, 2007    )

*Richard R. James,* of Glen Allen, VA, for the appellant.

*Brent A. Bowker,* with whom *Tim S. McClain,* General Counsel; *R. Randall Campbell*, Assistant General Counsel; *Richard Mayerick*, Deputy Assistant General Counsel, and *Barbara J. Finsness,* Appellate Attorney, all of Washington, D.C., for the appellee.

Before HAGEL, MOORMAN, and LANCE, *Judges.*

MOORMAN, *Judge*:  The appellant, Damian Reyes, through counsel, seeks review of an October 2, 2003, decision of the Board of Veterans' Appeals (Board) that denied his requests for waiver of pension overpayments in the amounts of $1,802.18 and $17,076 upon finding bad faith on his part in the creation of the debt.  Record (R.) at 9.  This appeal is timely and the Court has jurisdiction to review the Board decision pursuant to 38 U.S.C. §§ 7252(a) and 7266(a).  For the reasons set forth below, the Court will affirm, in part, and vacate, in part,  the Board's October 2003 decision as to the matters appealed and remand for further adjudication consistent with this decision.

## I. FACTS

Mr. Reyes served in the U.S. Army from April 1944 to February 1946.  R. at 13. In March 1991, he submitted an application for VA disability compensation and pension, which the VA regional office (RO) granted in April 1993.  R. at 16, 21.  His notice of award informed him of the

following :

> Your rate of VA pension depends on total "family" income which includes your income and that of any dependents. We must adjust your payments whenever this income changes. You must notify us immediately if income is received from any source other than that shown above. You must also report any changes in the income shown above. Your failure to promptly tell VA about income changes may create an overpayment which will have to be repaid.

R. at 23. He was notified of this requirement in several other letters from the RO, dated from July 1993 to February 1999. *See* R. at 42-43, 49, 55, 86, 179, 181, 203, 218, 229-30.

In September 1995, the RO notified Mr. Reyes that his pension payments had been reduced, effective from December 1, 1994, because he failed to report his wife's and son's receipt of Social Security benefits. R. at 58, 60. In November 1995, Mr. Reyes requested a waiver of this overpayment, asserting that he was unaware of the debt and that the reduction in his pension would cause an undue, financial hardship on him and his family. R. at 80. In December 1995, his pension was reduced again, based on notification that he had received pension fund payments. R. at 84, 95. He then filed a Notice of Disagreement (NOD), in which he requested an increase in his pension benefits because of his son's unemployment and loss of income. R. at 88. In February 1996, VA again adjusted his pension award, effective from February 1993, for failure to report wages. R. at 98. In March 1996, he requested waiver of this $945 overpayment, and asked VA to consider his personal medical expenses and current physical condition, as well as possible entitlement to improved pension with aid and attendance or housebound benefits. R. at 105.

On April 10, 1996, the VA Committee on Waivers and Compromises (Committee) denied Mr. Reyes's request for waiver of $945, after concluding that the debt was created in bad faith. R. at 109-10. On April 26, 1996, VA reduced his pension effective February 1995, and terminated the pension award effective from January 1, 1996, due to excessive income for pension. R. at 148. This created a total overpayment of $1,802.18. *Id.* Mr. Reyes requested a waiver of this overpayment and in a September 1996 Statement of the Case (SOC), the RO affirmed its denial of waiver in the amount of $1,802.18, after concluding, as the RO originally had, that the debt was created in bad faith because of Mr. Reyes's failure to timely report all sources of, and changes in, income. R. at 150. In October 1996, he filed an appeal with the Board, in which he also asserted entitlement to VA disability compensation for various injuries and disorders. R. at 152. In January 1998, the

2

Board remanded Mr. Reyes's appeal to the RO, instructing the RO to request from Mr. Reyes a list of all personal medical expenses from 1993 forward, and to adjudicate his claim as to the amount and propriety of the creation of each element of the overpayment. R. at 190. The Board, after determining that the claims were not inextricably intertwined with his overpayment issue, also referred claims for service connection for post-traumatic stress disorder, a back disorder, throat disorder, malaria, dysentery, a stomach disorder, and residuals of exposure to cold weather, to the RO for "appropriate action." R. at 188.

In April 1998, the RO requested the information from the appellant ordered by the Board's January 1998 remand. R. at 193. In a report of contact, a VA representative noted that Mr. Reyes "indicated he cannot remember expenses for the time frame requested because he is suffering from multiple medical problems, but he did not have any expenses because he receives almost all of his medical care and medications from the DVA [Department of Veterans Affairs] Medical Center." R. at 195.

In July 2000, Mr. Reyes notified the RO that he and his wife were no longer married. He requested VA reinstate his pension as a single veteran. R. at 233. In January 2001, the RO sent Mr. Reyes a notice, informing him that VA was terminating his pension benefits effective from February 1, 1997, until he responded to VA's September 2000 request for information regarding his wife's income from that time until the date of their divorce. R. at 238-39 (noting that his spouse had reported receipt of $5,200 in income in 1997, which was not reported to VA at that time). The RO sent another notice in March 2001, noting that it had received information that his former wife had received additional income in the amount of $6,996 in 1999 that was not reported to VA. R. at 243-44. In March 2001, Mr. Reyes paid the overpayment of $4,833 resulting from the unreported income from February 1997 to January 1998. R. at 257. Based on Mr. Reyes's wife's 1999 unreported income, VA notified Mr. Reyes in August 2001 that an additional overpayment, in the amount of $20,156, had been created. R. at 255.

On August 21, 2001, Mr. Reyes requested a waiver of the overpayment in the amount of $20,156. R. at 257. He noted that VA had instructed him, since his March 2001 payment, not to send any funds because his overpayments had been paid in full. R. at 257. In February 2002, the Committee denied his request for waiver, finding that the overpayment was created in bad faith. The Committee stated:

The evidence of record shows that you have been repeatedly advised that your pension was based on your total family income. Despite the VA's notices to accurately and promptly report your total family income, you failed to report your wife was working for years 1998 and 1999. A review of your claim file shows overpayments in the past, caused by your failure to inform the VA of your total family income. In spite of your previous overpayments you continued to submit eligibility verification reports (EVRs) which indicated your spouse was not in receipt of income. Your failure to report your spouse's income allowed you to receive benefits you were not entitled to receive.

Your failure to report your total family income and continued acceptance of VA pension based on the intentional omission of that income shows an intent to seek an unfair advantage. You had knowledge that failure to promptly report receipt of income would create an overpayment. . . . This constitutes bad faith.

R. at 270. Mr. Reyes filed an NOD as to this decision, asserting that he was not aware of the indebtedness, as he was in the process of divorcing his wife and was not aware of the income she received during that time. R. at 274. The Committee issued a Statement of the Case, affirming its decision to deny waiver of the overpayment. R. at 285. Mr. Reyes filed his appeal with the Board. R. at 288.

In the decision on appeal, the Board affirmed the Committee's decision to deny waiver of the $1,802.18 overpayment, and reduced the overpayment in the amount of $20,156 to $17,076, after concluding that $3,080 of the overpayment was not properly created because Mr. Reyes's pension benefits for a single veteran should have been reinstated following his divorce in July 2000. R. at 2. The Board concluded that despite Mr. Reyes's assertions that he was not aware of his wife's activities and earned income during that period because they were in the process of separating, in his eligibility verification reports for that time period, he noted that he was married, living with his spouse and that his spouse had not worked during the previous year and that no income was expected for her in the current year; thus, based on his assertions in these reports, the debt was properly created. The Board also determined that the overpayment in the amount of $1,802.18 was properly created because of Mr. Reyes's failure to accurately report all sources of income, including Social Security benefit payments. R. at 4.

The appellant makes five assertions of error on appeal. First, he avers that the regulatory definition of bad faith, at 38 C.F.R. § 1.965(b)(2) (2003), confers unfettered discretion upon VA to deny waivers whenever it so chooses, contrary to the legislative intent of 38 U.S.C. § 5302(c).

4

Second, he asserts that the Board failed to comply with *Stegall v. West*, 11 Vet.App. 268, 271 (1998), by not ensuring the adjudication of the claims for service connection previously referred to the RO by the Board in its January 1998 decision. Third, he argues that the Board did not provide an adequate statement of reasons and bases for its decision because it failed to consider 38 C.F.R. §§ 1.931(a),(b) (2003); 1.941(b) (2003); 1.942(a) (2003), provisions that allow for suspension, termination, or compromise of debt. Next, the appellant maintains that pursuant to 38 C.F.R. § 1.913 (2003), VA should have conducted a personal interview. Finally, he avers that the Court should reconsider its decision in *Barger v. Principi*, 16 Vet.App. 132 (2002), and apply the requirements of 38 U.S.C. § 5103(a) and 38 C.F.R. § 3.159 to waiver claims. Appellant's Brief (App. Br.) at 14.

## II. ANALYSIS

### A. 38 U.S.C. § 5302: Statutory Bars to Waiver of Overpayments

Pursuant to 38 U.S.C. § 5302(a) "[t]here shall be no recovery of payments or overpayments (or any interest thereon) of any benefits under any of the laws administered by the Secretary whenever the Secretary determines that recovery would be against equity and good conscience." Although this provision, at first blush, appears to set no limit on when a waiver of debt or overpayment may be permitted, such requests for waiver are constrained by three specified statutory bars set forth in 38 U.S.C. § 5302(c). That provision absolutely precludes the Secretary from granting a waiver, "if, in the Secretary's opinion, there exists in connection with the claim for such waiver *an indication of fraud, misrepresentation or bad faith* on the part of the person or persons having an interest in obtaining a waiver of such recovery or the collection of such indebtedness." 38 U.S.C. § 5302(c) (emphasis added); *see also Farless v. Derwinski,* 2 Vet.App. 555, 556 (holding that "[b]efore the Board may determine whether 'equity and good conscience' affords waiver, however, it must determine whether 'there exists . . . an indication of fraud, misrepresentation or bad faith.' . . . If such is found, the Board cannot waive the indebtedness by inquiry into 'equity and good conscience' criteria"). Thus, at issue in this case is the Secretary's interpretation of a statute, and his implementing regulation, that create an absolute bar to any consideration of equitable relief regarding waiver of any debt owed to VA. The Court will now examine, therefore, the legislative history of the statute, as well as the Secretary's regulatory implementation, to discern whether the

5

Secretary's interpretation of "bad faith" is permissible. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984) (holding that where a statute has a plain meaning, the Court shall give effect to that meaning; however, where statute is silent as to the matter at issue, the Agency's attempt at filling the gap left by the statute should be afforded deference); *see also NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 123 (1987) (holding that if a statute is silent as to the matter at issue, Agency's attempt at filling the gap "will generally be sustained as long as it reflects a permissible construction of the statute"); *cf. Smith (Ellis) v. Nicholson*, 451 F.3d 1344, 1350 (Fed. Cir. 2006) (holding that where VA merely replaces statutory ambiguity with regulatory ambiguity, VA's interpretation of its own regulation "becomes 'of controlling weight unless it is plainly erroneous or inconsistent with the regulation'" (internal citations omitted)).

*1. Statutory Language and Legislative History*

In 1989, Congress amended section 5302(c), to replace the then-existing standard barring waiver if there was "an indication of fraud, material fault, or lack of good faith," with the current standard barring waiver if there is "an indication of fraud, misrepresentation or bad faith[.]" *See* Pub. L. 101-237, § 311(2)(B), 103 Stat. 2062, 2076 (Dec. 18, 1989). In regard to this change from "lack of good faith" to "bad faith," although focusing mainly on collection of home-loan debts, Representative Montgomery, on behalf of the U.S. House of Representatives Committee on Veterans Affairs, reported that the provision "would, effective upon enactment, (1) generally make mandatory the granting of waivers of home-loan debts if collection of the debt would be against equity and good conscience; and (2) prohibit waiver in cases involving 'fraud, misrepresentation, or bad faith.' The Committees intend that a borrower's abandonment of a mortgage despite having the financial ability to make the mortgage payments be considered 'bad faith' in connection with the default and that 'misrepresentation' include only a material misrepresentation." Veterans' Health Care Programs Amendments of 1989, 135 CONG. REC. H9095, H9115 (daily ed. Nov. 20, 1989) (statement of Rep. Montgomery). Further, in reporting before the U.S. House of Representatives on the proposed change, Representative Montgomery stated:

> It has always been the Congress' intent to afford waiver relief when equitable considerations warrant it. . . . Although the law permits waiver whenever collection of the indebtedness would violate equity and good conscience, the Department relies heavily on two additional criteria – balancing of fault and the veteran's ability to repay. The committee disagrees with the Department's undue emphasis on these two

6

criteria. By disagreeing, *the committee does not imply that it condones fraud, waste, or gross neglect on the veteran's part.* The committee believes that if the veteran is not at fault in creating an indebtedness due to improper action or lack of action by the Department, relief should be granted to the veteran in such cases.

Veterans' Home Loan Mortgage Indemnity Act of 1989, 135 Cong. Rec. H2289, H2291 (daily ed. June 6, 1989) (statement of Rep. Montgomery).

Specifically, in regard to bad faith, Senator Cranston reported:

The compromise agreement includes a provision to modify section 3102 of title 38 to make such debt waivers mandatory, rather than discretionary, if the veteran meets the 'equity and good conscience' test. Current law prohibits waivers in cases involving 'fraud, misrepresentation, material fault, or lack of good faith' in obtaining the waiver; the compromise agreement would modify this list to include only 'fraud, misrepresentation, or bad faith.' The committees deleted 'material fault' because it is subsumed within the other terms and *used the term 'bad faith' to require a higher standard of culpability in order to deny a waiver.*

Veterans' Benefits Amendments of 1989, 135 Cong. Rec. S16443-01, S16460 (daily ed. Nov. 20, 1989) (statement of Sen. Cranston) (emphasis added).

The intent of Congress, as well as the plain language of the statute, is not clear as to what precisely was meant by "bad faith." Rather, it is only clear that in requiring an affirmative showing of bad faith, Congress intended to mandate a "higher standard of culpability to deny waiver." *Id.* No standards were provided, other than the abandonment of the payment of a mortgage secured through the VA home loan program when one is financially able to continue such payments, for determining what actions could constitute "bad faith." Thus, the term "bad faith" is sufficiently vague to allow VA to exercise its 38 U.S.C. § 501 rulemaking authority and "fill the gaps" left by the statute. *See Chevron, U.S.A., Inc.,* 467 U.S. at 842-43; *see also NLRB*, 484 U.S. at 123; *see also* Black's Law Dictionary 134 (7th ed. 1999) (defining "bad faith" as "dishonesty of belief or purpose" and recognizing that "'[a] complete catalogue of types of bad faith is impossible but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance'" (internal citations omitted)).

*2. Regulatory Interpretation*

7

Following the statutory amendment, the Secretary amended 38 C.F.R. § 1.965(b)(2), providing this definition:

> Bad faith. This term generally describes unfair or deceptive dealing by one who seeks to gain thereby at another's expense. Thus, a debtor's conduct in connection with a debt arising from participation in a VA benefits/services program exhibits bad faith if such conduct, although not undertaken with actual fraudulent intent, is undertaken with intent to seek an unfair advantage, with knowledge of the likely consequences, and results in a loss to the government.

38 C.F.R. § 1.965(b)(2) (1993); *see also* 57 Fed. Reg. 15,046 (Apr. 24, 1992) (noting that Pub. L. No. 101-237 "removed material fault and lack of good faith as absolute bars to waiver and replaced them with bad faith. As a result, we must now revise the three regulations to comply with these new requirements"). The Secretary, in promulgating this regulatory definition, provided no guidance as to how this definition should be applied. *See* 57 Fed. Reg. 15,046. In the notice of final rulemaking, VA recognized the Court's decision in *Farless, supra*, which noted an inconsistency between the authorizing statutory provision, 38 U.S.C. § 5302, and the implementing regulation, 38 C.F.R. § 1.965(b)(2), in that the regulation failed to include the statutory language "indication of" prior to "fraud, misrepresentation or bad faith." 58 Fed. Reg. 3840 (Jan. 12, 1993). The only change to the proposed regulation in the final rule was to include this introductory language. Furthermore, the Secretary appears not to have provided further guidance in his adjudication manual regarding how this provision should be applied.

The appellant asserts that this regulatory interpretation of "bad faith," as applied, is too broad and essentially allows VA "unfettered discretion . . . to deny as many waivers as it wishes, thereby thwarting the legislative intent." Appellant's Reply Brief at 11. The Court does not agree. The mere fact "that the application of the VA regulations as a practical matter may benefit one class of veterans more than another, or not benefit one class of veterans at all, is not grounds for finding the VA's interpretation unreasonable." *Nat'l Org. of Veterans' Advocates v. Sec'y of Veterans Affairs,* 476 F.3d 872, 877 (Fed. Cir. 2007). Rather, the Court concludes that the Secretary's regulatory interpretation as set forth in § 1.965(b)(2), which requires an affirmative showing that (1) the appellant's conduct was undertaken with an intent to seek an unfair advantage, (2) with knowledge of the likely consequences, and (3) that resulted in a loss to the government, is consistent with the

intent of Congress in requiring a higher degree of culpability to bar waiver, and is not "plainly erroneous." *Smith (Ellis)*, 451 F.3d at 1350.

## B. Application of § 1.965(b)

Having concluded that the Secretary's interpretation of the statutory term "bad faith" is consistent with the legislative intent of Congress and not plainly erroneous, the Court must now examine the application of that interpretation in this instance. *See Butts v. Brown*, 5 Vet.App. 532, 539-40 (1993) (holding that the appropriate standard of review for an issue of application of law to the particular facts of a case is the "arbitrary, capricious, abuse of discretion, or otherwise not in accordance with law" standard of review). In light of the legislative history of 38 U.S.C. § 5302(c), which places the burden of proof on the Secretary to make an affirmative finding of "bad faith," we conclude that the Secretary's application of the statutory bar of bad faith in this instance was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 38 U.S.C. § 7261(a)(3)(A); *see also Butts,* 5 Vet. App. at 539-40.

The Board, in each decision, must provide a written statement of the reasons or bases for its findings and conclusions on all material issues of fact and law presented on the record; adequate to enable a claimant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court. *See* 38 U.S.C. § 7104(d)(1); *Allday v. Brown*, 7 Vet.App. 517, 527 (1995); *Simon v. Derwinski*, 2 Vet.App. 621, 622 (1992); *Gilbert v. Derwinski*, 1 Vet.App. 49, 57 (1990). To comply with this requirement, the Board must analyze the credibility and probative value of the evidence, account for the evidence that it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant. *See Caluza v. Brown*, 7 Vet.App. 498, 506 (1995), aff'd per curiam, 78 F.3d. 604 (Fed. Cir. 1996) (table); *Gabrielson v. Brown*, 7 Vet.App. 36, 39-40 (1994); *Gilbert, supra*. The clear intent of Congress was to "make debt waivers mandatory, rather than discretionary, if the claimant meets the 'equity and good conscience' test"; and, it was the equally clear intent of Congress to require "a higher standard of culpability in order to deny a waiver" by adopting the "bad faith" test. 135 CONG. REC. S16443-01, S16460. Thus, it is the Secretary's burden to prove bad faith, and it is the Board's responsibility to clearly articulate its reasons or bases for finding that it exists. To make such findings, when raised on the

9

record, the Board should consider any evidence and relevant factors bearing on the claimant's knowledge of the need to report and his awareness of income subject to reporting. During oral argument, the appellant's counsel raised several such factors that could warrant comment by the Board, in this instance and in general when considering the existence of bad faith in requests for waivers. These included the level of the claimant's education, the existence of any language barriers, any assistance the claimant may have had in completing the income-reporting forms, information submitted to any other federal agency requiring income-reporting from the claimant during the time period in question, and any statements from friends and family members regarding his or her knowledge and intent in attempting to comply with the requirements by reporting changes in income over the years.

In this instance, the Board concluded that the appellant acted in bad faith because "he persistently failed to accurately report his family income. His actions, which gave rise to this overpayment, demonstrate an intent to seek unfair advantage with regard to VA pension benefits. Further, he had been informed of the likely consequences, and his intentional failure to report income resulted in a loss to the government in the amount of the overpayment." R. at 8. Thus, although the Board concluded that the appellant had been "informed" of the need to report changes in income, the Board failed to discuss the appellant's knowledge of the need to report income and his awareness of the income that he failed to report. Such discussion is essential to an informed review by the Court of the Board's finding that the appellant's failure to report income was an intentional act. 38 C.F.R. § 1.965(b)(2) (requiring a showing of actual "intent to seek an unfair advantage" to find bad faith). Furthermore, the only evidence the Board evaluated and apparently relied upon was provided by the appellant's own statements. In doing so, the Board failed to address fully his assertions that he was not aware of the consequences of failing to timely report, that he believed he was entitled to the funds, or that he was unaware of his wife's receipt of income from 1998 to 1999 due to their pending divorce proceedings. Therefore, in relying solely on the appellant's own reports to find that he acted in bad faith, without further addressing the other relevant evidence, the Board failed to comply with its duty to fully explain the basis for its decision that the evidence was sufficient to find that the statutory bar to equitable consideration should be

10

applied. Thus, remand is required for the Board to provide an adequate statement of reasons or bases for its decision to deny the appellant a waiver based on the conclusion that he acted in bad faith in the creation of the debt. 38 U.S.C. § 7104(d)(1). Upon remand, the Board should consider the factors noted above that were raised in the first instance by the appellant's counsel during oral argument. *See Maggitt v. West*, 202 F.3d 1370 (Fed. Cir. 2000).

### C.  Failure to Consider 38 C.F.R. §§ 1.931(a),(b); 1.941(b); 1.942(a)

The appellant asserts that the Board provided an inadequate statement of reasons or bases because it failed to discuss 38 C.F.R. § 1.931(a), inability to pay, §1.941(b), suspension of collection activity, and § 1.942(a), termination of collection activity. Initially, the Court notes that pursuant to 38 C.F.R. § 1.901 (2003), "[t]he standards set forth in §§ 1.900 through 1.954 shall apply to VA handling of civil claims for money and property but the failure of the agency to comply with any provision of the standards shall not be available as a defense for any debtor." The Secretary asserts that these provisions are not relevant to the present situation because those regulations "pertain to housing and small business loans . . . In addition, these provisions pertain to the collection of the debt, not whether the debt is valid or whether recovery of the debt may be waived." Secretary's Brief  at 16.  As to the Secretary's first assertion, the Court finds no limitation in the statutory or regulatory provisions that restricts their application to cases involving housing or small business loan debt.  Rather, 38 C.F.R. § 1.907 specifically states that "the terms 'claims' and 'debt' are synonymous and interchangeable.  They refer to any amount of money or property which has been determined by an appropriate official of the VA to be owed to the United States by any person, organization or entity, except another federal agency." 38 C.F.R. § 1.907(a) (2003).  However, the Court concludes that because the issue before the Board was whether the appellant's debt was valid, not whether it could be collected, consideration of the collection provisions by the Board prior to a determination on the validity of the debt would have been premature.  Thus, the Court can find no error with the Board's  failure to consider these inapplicable regulations. *See Schafrath v. Derwinski*, 1 Vet.App. 589, 593 (1991) (holding that the Board is required to consider all evidence of record and to consider, and discuss in its decision, all "potentially applicable" provisions of law and regulation); *see also* 38 U.S.C. § 7104(a); *Charles v. Principi*, 16 Vet.App. 370, 373 (2002).

11

D.  Failure to Conduct a Personal Interview Pursuant to 38 C.F.R. § 1.913 (2003)

Pursuant to 38 C.F.R. § 1.913, VA "will, to the extent feasible, undertake personal interviews whenever requested by debtors and in other cases having regard for the amounts involved and the proximity of agency representatives to the debtors." 38 C.F.R. § 1.913 (2003); *see also* 69 Fed. Reg. 62188, 62195 (Oct. 25, 2004) (amending VA's debt collection regulations to comply with the Debt Collection Improvement Act of 1996, Pub. L. 104-134, 110 Stat. 1321, 1358, and in the process of amending these provisions, removing 38 C.F.R. § 1.913 (2003)). Again, the Court notes that pursuant to 38 C.F.R. § 1.901 (2003), VA's failure to comply with this provision is not available as a "defense" for the debtor. Even assuming that this provision could be a basis for remand, the appellant does not assert, nor does the record indicate, that at any time during the course of his appeal he "requested" such a personal interview as required by 38 C.F.R. § 1.913 (2003). The Court concludes, therefore, that remand for compliance with this provision is not warranted.

E.  *Stegall* Violation

The appellant asserts that the Board failed to comply with *Stegall*, *supra*, in ensuring compliance with the 1998 Board's referral of claims for VA disability compensation for development and adjudication by the RO. Pursuant to *Stegall*, "a remand by this Court or the Board imposes upon the Secretary of Veterans Affairs a concomitant duty to ensure compliance with the terms of the remand. . . . [and] where . . . the remand orders of the Board or this Court are not complied with, the Board itself errs in failing to insure compliance." 11 Vet.App. at 272. In this instance, the Board, in its 1998 decision, referred rather than remanded the claims to the RO for adjudication. *See Link v. West*, 12 Vet.App. 39, 47 (1998) (holding that claims referred by the Board are not ripe for review by the Court). These claims were not before the Board when it issued its decision on appeal. Thus, the Court cannot conclude that the Board erred in failing to ensure compliance with *Stegall, supra*, in regard to the claims that were referred to the RO in the 1998 Board decision.

F.  38 U.S.C. §5103 (a)

The appellant urges the Court to reconsider its decision in *Barger, supra*, that the notice provisions of 38 U.S.C. § 5103(a) do not apply to claims involving waiver of debt. *See Barger*,

12

16 Vet.App. at 137-38 (finding no error with the notice provided to the appellant pursuant to the specific statutory notice provisions regarding waiver of debt under 38 U.S.C. § 5302(a)). The Court has consistently held that the notice provisions of 38 U.S.C. § 5103(a) do not apply to debt waiver claims, and thus, finds no error with the Board's decision in this regard. *See Lueras v. Principi*, 18 Vet.App. 435, 438 (2004) ("The language in *Barger* clearly and explicitly precludes application of the VCAA [Veterans Claims Assistance Act of 2000, Pub. L. No. 106-475, 114 Stat. 2096] notice provisions to chapter 53 proceedings.").

### G. Arguments Presented for the First Time

The appellant raised on appeal, for the first time, several arguments during the course of oral argument. Although the appellant urges that these issues are ripe for review because they were first addressed by the Secretary in his brief, the Court does not agree. If the appellant believed that such issues were critical to the proper resolution of this appeal, he should have addressed them thoroughly in his reply brief. It is not appropriate, however, for an appellant "'to raise, for the first time, an issue for appellate review'" during the course of oral argument. *Carbino v. West,* 168 F.3d 32, 34 (Fed. Cir. 1999) (quoting *Amhil Enters. Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1563 (Fed. Cir. 1996)).

The Federal Circuit and this Court consistently have held that "[a]n improper or late presentation of an issue or argument under the court's rules need not be considered and, in fact, ordinarily should not be considered." *Carbino*, 168 F.3d at 34; *see Tubianosa v. Derwinski*, 3 Vet.App. 181, 184 (1992) (noting that the Secretary "should have developed and presented *all* of his arguments in his initial pleading") (emphasis in original). Furthermore, "[a]dvancing different arguments at successive stages of the appellate process does not serve the interests of the parties or the Court. Such a practice hinders the decision-making process and raises the undesirable specter of piecemeal litigation." *Fugere v. Derwinski*, 1 Vet.App. 103, 105 (1990).

### III. CONCLUSION

After consideration of the appellant's and the Secretary's briefs, oral argument as presented on April 25, 2007, and a review of the record on appeal, the Board's October 2, 2003, decision is

13

AFFIRMED to the extent the Board concluded that the notice provisions of 38 U.S.C. § 5103 were not applicable. This decision is VACATED to the extent that the Board concluded the appellant acted in bad faith in the creation of the overpayment, and REMANDED for further adjudication consistent with this decision.